**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
         *Plaintiff-Appellee,*

v.

DANIEL BRAVO-MUZQUIZ,
         *Defendant-Appellant.*

No. 03-50505

D.C. No.
CR-02-02335-BTM

OPINION

Appeal from the United States District Court
for the Southern District of California
Barry T. Moskowitz, District Judge, Presiding

Argued and Submitted
October 5, 2004—Pasadena, California

Filed June 16, 2005

Before: Procter Hug, Jr., Thomas G. Nelson, and
Kim McLane Wardlaw, Circuit Judges.

Opinion by Judge Hug

**COUNSEL**

Michelle Betancourt, Federal Defenders of San Diego, Inc., San Diego, California, for the defendant-appellant.

Mark R. Rehe, Assistant United States Attorney, San Diego, California, for the plaintiff-appellee.

**OPINION**

HUG, Circuit Judge:

Daniel Bravo-Muzquiz (Bravo) was convicted of a violation of 18 U.S.C. § 922(g)(5)(A), being an alien illegally or unlawfully in the United States and possessing a firearm. Prior to the time of the possession of the firearm, the INS had initiated removal proceedings against him for being illegally in the United States and he had been released on an immigration bond. The essential issue in this appeal is whether the release on that bond changed his status so that he was no longer an "alien illegally or unlawfully in the United States." The district court held that the release on bond did not change his

status. Bravo contends that the district court erred in this determination and that the court erred in giving an instruction and denying a judgment of acquittal based on that determination. Bravo also raised two sentencing issues, contending that the district court erred in failing to grant two downward adjustments to his sentence. We have appellate jurisdiction pursuant to 28 U.S.C. § 1291 and we affirm the conviction, but remand for reconsideration of the sentence.

## I.

### Factual and Procedural Background

Bravo illegally entered the United States in 1985. In 1988, he applied for temporary resident alien status under a then-existing agricultural amnesty program, which status was granted and annually renewed for several years. In 1992, his application for continuation under the program was denied. His appeal of this decision was also denied in 1995. From that time forward, Bravo filed no other application to adjust his immigration status although he continued to live and work in the United States.

On October 27, 2001, Bravo was detained at the Temecula, California checkpoint after he appeared nervous and failed to make eye contact with the border inspector upon being questioned about his immigration status. He was then referred to the secondary inspection area. At the secondary inspection area, Bravo produced an immigrant card that the inspector determined to be fraudulent. At that point, Bravo acknowledged that he was in the United States illegally. Upon further search of his wallet, the inspector also discovered an expired employment authorization card, an invalid social security card, and a "Basic Gun Safety Card," issued by the State of California. Bravo was arrested and placed in detention. On the same day, removal proceedings were initiated. On November 8, 2001, he obtained an immigration bond and was released

from custody pending the conclusion of the removal proceedings.

ATF agents went to Bravo's home on December 21, 2001, based upon a tip provided by the Temecula border patrol inspectors that Bravo may have been in possession of firearms. The agents questioned him about his possession of weapons and asked to search his home. Bravo was cooperative and granted them permission to conduct a search. He led the officers to his bedroom and handed them an empty gun case and then left the room. The agents then searched the closet where they found an unloaded Kimber .45 caliber handgun.

Some two months later, a two-count indictment was filed against him for violating 18 U.S.C. § 922(a)(6), making false statements in the acquisition of a firearm, and 18 U.S.C. § 922(g)(5)(A), being an alien illegally or unlawfully in the United States in possession of a firearm. The first charge arose from his application to purchase the Kimber handgun in August 2001, and the second charge arose from the ATF's search of his home on December 21, 2001.

A jury trial was held commencing in May 2003. The evidence produced at the jury trial showed that Bravo had purchased the Kimber handgun on lay away in August 2001, however, he did not take actual possession of the weapon until November 9, 2001, one day after he was released on bond pending his removal proceedings. Following the government's case in chief, Bravo moved for a judgment of acquittal. He argued that at the time he took possession of the handgun and on the date of the charged offense, December 21, 2001, he was not an "alien illegally or unlawfully in the United States" because he had authority to remain in the United States because he had been released on bond. The district court disagreed and denied the motion.

At the end of the presentation of evidence, the parties conferred to discuss jury instructions. Over Bravo's objection, the

district court gave an instruction defining the meaning of an "alien unlawfully or illegally in the United States" as a person present in the United States without authorization. The instruction went on to state that being released on bond did not in itself constitute authorization "unless the alien has also filed an application or petition to legalize his status."

The jury found Bravo guilty of count two of the indictment, being an alien illegally or unlawfully in the United States in possession of a firearm. The jury was unable to reach a verdict as to count one of the indictment, making false statements in connection with the purchase of a firearm. The district court ordered a mistrial on that count. Bravo appeals his conviction on count two of the indictment.

## II.

### Discussion

Bravo's main contention on appeal is that he was lawfully present in the United States at the time he was found in possession of the handgun because he was authorized to be present as a result of his release from custody on bond. He argues that the district court erred by denying his motion for a judgment of acquittal because he could not have violated 18 U.S.C. § 922(g)(5)(A) as a matter of law. Additionally, he challenges the district court's jury instruction on this point. First, he argues that the instruction was a misstatement of the law. In the alternative, he contends that the instruction removed the only contested issue from the jury's consideration, that is whether he was an alien illegally or unlawfully in the United States at the time of the offense. Therefore, according to Bravo, the instruction directed a verdict for the prosecution in violation of his due process rights.

### A. Motion for Judgment of Acquittal

A trial court's ruling on a motion for judgment of acquittal and its interpretation of the legal elements of the offense are

reviewed *de novo*. *United States v. McNeil*, 320 F.3d 1034, 1035 (9th Cir. 2003).

**[1]** It is unlawful for an alien who is illegally or unlawfully in the United States to "possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." 18 U.S.C. § 922(g). Bravo does not contest the commerce aspect of the statute and the only statutory issue is whether Bravo was illegally or unlawfully in the United States at the time of the possession offense. Although there is no statutory definition of the term "alien illegally or unlawfully in the United States," the administrative regulation interpreting that section does provide a definition. It states in relevant part that, "[t]he term includes any alien . . . [w]ho is a nonimmigrant and whose authorized period of stay has expired . . . ." 27 C.F.R. § 478.11(b). Bravo admits he is a nonimmigrant whose authorized period of stay expired. However, he argues that the issuance of an immigration bond provides authorization for him to remain in the United States and that this takes him out of the category of an alien who is unlawfully present in the United States.

In *United States v. Garcia*, 875 F.2d 257 (9th Cir. 1989), we held that an alien who had not been legally admitted to enter the United States and who had not applied for legal status at the time he possessed a firearm was "illegally or unlawfully in the United States" for purposes of section 922(5)(g). *Id.* at 257-58. Implicitly this recognizes that had Garcia applied for legal status prior to his possession of the firearm he would not have been at that time an alien illegally or unlawfully in the United States. The case does not address any change in status due to a release on an immigration bond.

Bravo relies on *United States v. Hernandez*, 913 F.2d 1506 (10th Cir. 1990), which holds that aliens in the process of applying for legalization of their immigration status are not unlawfully in the United States and are not subject to deporta-

tion. The case cites two statutes, 8 U.S.C. §§ 1160(d) and 1255a(e). Both statutes specifically provided that during those applications for legalization the alien may not be deported. Bravo did not have an application for legalization pending. However, Bravo contends that even though that is not the situation here, his situation of being released on bond is analogous to the situation in *Hernandez*. There is no precedent in this circuit nor in the opinions of other circuits suggesting that the situations are analogous.

**[2]** Bravo relied in his brief on a district court case, *United States v. Atandi*, 228 F. Supp. 2d 1285 (C.D. Utah 2002). There the district court held that the alien was not illegally or unlawfully in the United States because he was in immigration proceedings and released on bond, but had not yet been ordered removed from the United States. That case has since been reversed by the Tenth Circuit Court of Appeals in *United States v. Atandi*, 376 F.3d 1186 (10th Cir. 2004). The circuit court expressly rejected the alien's argument that he was authorized to remain in the United States pending resolution of his removal proceedings, and thus, could not have violated section 922(g)(5)(A). Being on the bond obviously made no difference in the court of appeals' decision. The court stated,

> The government's effort to remove an illegal alien does not somehow designate the alien as "lawfully" in the country for purposes of § 922(g)(5)(A) during the pendency of the removal proceedings.
>
> Furthermore, we note that Atandi's interpretation of § 922(g)(5)(A) would lead to absurd results. We can envision no reason why Congress would grant illegal aliens the ability lawfully to arm themselves precisely at the moment the government commences its effort to remove them from the country.

*Id.* at 1190 n.9. We agree with this statement by the Tenth Circuit. The alien's status is not changed while he is in the

course of removal proceedings whether or not released from custody on bond. The purpose of releasing an alien on bond is simply to release him from custody while his immigration proceedings are ongoing. It is not to change his status. The district court did not err in its interpretation of the law on this point and therefore it did not err in denying Bravo's motion for a judgment of acquittal.

## B.   Jury Instruction

[3] The jury instruction provided by the district court defining the meaning of an alien illegally or unlawfully in the United States was a correct statement of the law and did not constitute a directed verdict for the prosecution. The portion of the instruction to which Bravo objected stated:

> Release on bail or the granting of employment authorization pending a deportation or removal hearing do not themselves constitute authorization to remain in the United States unless the alien has also filed an application or petition to legalize his status.[1]

---

[1]The district court's entire instruction was as follows:

An alien is in the United States illegally and unlawfully if the alien is in the United States without authorization. An alien who has filed an application for legalization of his immigration status is not illegally or unlawfully in the United States while the application is pending. This is so because an alien is authorized to remain in the United States while the application for legalization is pending. However, if the application is denied, the alien is thereafter in the United States without authorization.

Therefore, it is not a violation of federal law for an alien to purchase or possess a firearm at such time as his application for legalization is pending.

Release on bail or the granting of employment authorization pending a deportation or removal hearing do not themselves constitute authorization to remain in the United States unless the alien has also filed an application or petition to legalize his status.

An application for legalization is called an application or petition for adjustment of status.

Both of Bravo's challenges to the instruction depend entirely upon the district court's determination as a matter of law that an alien is not lawfully or legally present in the United States for purposes of section 922(g)(5)(A) solely because he has been released on bond. This is a question of law for the court, not a question of fact for the jury. Because we agree with the district court and hold that such a person is not lawfully present under these circumstances, these challenges lack merit.

## C.   Sentencing Issues

Pursuant to U.S.S.G. § 2K2.1(b)(1), the district court applied a two-level sentencing enhancement to Bravo's sentence due to the number of firearms he had purchased over the years. This increased his base offense level from 14 to 16. The district court refused to grant a downward adjustment pursuant to U.S.S.G. § 2K2.1(b)(2) based on Bravo's contention that he had purchased the guns solely for sporting purposes. The district court also refused a two-level downward adjustment for acceptance of responsibility. U.S.S.G. § 3E1.1.

**[4]** Because Bravo did not challenge his sentence on Sixth Amendment grounds in the district court, we grant a "limited remand" pursuant to *United States v. Ameline*, No. 02-30326, slip op. at 6368-71 (9th Cir. June 1, 2005) (en banc).

### Conclusion

We affirm Bravo's conviction and remand for reconsideration of the sentence.

**AFFIRMED AND REMANDED.**